**Affirmed and Majority and Concurring Opinions filed April 4, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00679-CV

---

### TEXAS DEPARTMENT OF PUBLIC SAFETY, Appellant

### V.

### RATAN ZAKIR, Appellee

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2018-90845**

---

## M A J O R I T Y   O P I N I O N

Ratan Zakir sued the Texas Department of Public Safety ("DPS") under the Texas Torts Claims Act ("TTCA") alleging that she was injured when her vehicle collided with one driven by a DPS peace officer. In this interlocutory appeal, DPS challenges the trial court's denials of its plea to the jurisdiction and motions for summary judgment based on sovereign immunity. Specifically, in two issues, DPS asserts that the trial court erred by failing to dismiss the case for want of jurisdiction because DPS retained immunity both under the emergency exception

of the TTCA and because the officer was shielded by official immunity. We affirm the denials of the plea and motions.

## *Background*

On April 11, 2018, Zakir was involved in a vehicle collision with DPS Sergeant Richard Standifer. At the time of the collision, Standifer had just entered an intersection against a red light to pursue a vehicle that had run the red light when the vehicle driven by Zakir hit the side of Standifer's patrol car. In her lawsuit, Zakir alleges that Standifer's actions caused the collision and her resulting "serious personal injury and property damage." She further asserts that the TTCA waives DPS's sovereign immunity for claims involving personal injury and property damage caused by the negligent operation or use of a motor-driven vehicle by a DPS employee under the circumstances alleged. *See* Tex. Civ. Prac. & Rem. Code § 101.021(1).

DPS answered the lawsuit and filed a plea to the jurisdiction and, in the alternative, motions for traditional and no-evidence summary judgment. As mentioned, DPS argued that sovereign immunity barred Zakir's lawsuit both because it retained immunity under the emergency exception to the TTCA and because Standifer enjoyed official immunity as a governmental employee conducting an emergency response in good faith. Zakir responded to the plea and the motions, and both sides submitted evidence including affidavits by Standifer and his supervisor, Lieutenant Craig Cummings; a DPS accident report; dash cam video of the incident from Standifer's patrol car; and deposition transcripts for Zakir, Standifer, and eyewitness Maria Martinez.

The 30-second dash cam video starts when Standifer first pulls up to the intersection and stops for a red light. The road he is on appears to be a little lower than the main road; it is tree lined; and there appears to be a brick sign in the

median of the road that potentially limits visibility from the main road. When Standifer comes to a stop, he is the fifth vehicle in the right lane and a Chevrolet Cavalier is the only vehicle in the left, turn-only lane. When vehicles in the right lane begin to turn right against the red light, the Cavalier also drives through the intersection, making a left turn. It is impossible to tell whether the driver of the Cavalier thought the light had changed because cars in the right lane had begun to go or if the driver just decided to run the red light. As the Cavalier runs the light, Standifer moves to the left lane and accelerates towards the intersection. Standifer enters the intersection at the 23 second mark on the video and slows as he does so, coming to a complete stop in the intersection at 25 seconds. Cars are still crossing the far side of the intersection at this point, likely necessitating Standifer's coming to a stop. It would be reasonable to conclude that Standifer's vehicle would have hit at least one of the cars on the far side had he not stopped when he did. The impact from Zakir's vehicle occurs at the 26 second mark on the video, which ends shortly thereafter.

In his affidavit, Standifer first detailed his training and experience and then described the incident from his perspective. He stated that when he moved into the left lane to pursue the Cavalier, he activated his emergency lights and utilized his "air horn siren" as he approached the intersection. He explained that he looked in both directions at the intersection and saw vehicles "slowing down and coming to a stop prior to [his] entry" into the intersection. He said that he only proceeded once the intersection was clear; he then proceeded slowly in an effort to pursue the Cavalier and initiate a traffic stop. Once he was in the intersection, Standifer stated that he saw Zakir's vehicle approaching him but not slowing down. He stopped so that she could swerve to avoid him, but instead, she hit his vehicle.

Standifer asserted that at all relevant times, he was in the course and scope

3

of his employment, acting in good faith and not recklessly, and he made the discretionary decision to activate his lights and air horn. He believed that the Cavalier, having disregarded the red light after Standifer approached the intersection, necessitated immediate pursuit, and he opined that a reasonable officer in the same or similar circumstances would have determined that the need for pursuit outweighed the potential risk to the public. He also stated that during the event, he was constantly evaluating circumstances and risks and whether other motorists could see him, and he noted it was a clear, sunny, and dry day.

In his deposition, Standifer explained that at the time of the incident, his primary duties were as a public information officer, and he was on his way back from lunch when he saw the Cavalier run the red light. This was his third vehicle collision as a peace officer. He said that he looked both ways before entering the intersection and made sure traffic was beginning to stop before entering, but he acknowledged after watching the video that he did not pause before entering the intersection. At one point, Standifer said that any time an officer activates his emergency lights, it is probably an emergency situation or an enforcement action, but he later said that activating the lights indicated it was an emergency. He also stated his belief that there is no "such thing as a routine traffic stop" because you do not know if the driver is going to stop. He considered the situation precipitating the collision as an emergency because the Cavalier ran a red light. He said this posed a high risk of danger to the public, and he did not believe the Cavalier driver just made a mistake in running the light. He said he had no idea why the Cavalier ran the red light but it did not matter. When he began his pursuit of the Cavalier, he was attempting to enforce the traffic laws. He again asserted that after he activated his lights, vehicles began to stop so the intersection was clear when he entered it. Regarding visibility at that intersection, he stated that you cannot see both ways

4

down the main street until you reach the crosswalk and the "mouth of the intersection." This is in part due to the fact there is a sign identifying the neighborhood at the intersection. Because of this, he speculated that Zakir would have had a maximum of three seconds to spot his vehicle before the collision. Standifer testified the speed limit in that area for the road Zakir was on was 40 miles per hour. He said that she may not have been able to see him until he was actually in the intersection. Standifer said he pushed his air horn siren only for "a couple of blips." He acknowledged the officer who investigated the incident found him at fault, but Standifer disagreed with that conclusion.

In his affidavit, Lieutenant Cummings stated he was Standifer's supervisor and he had viewed the reports, dash cam video, and Standifer's affidavit. Cummings opined that at the time of the collision, Standifer was operating in the course and scope of his employment and discharging a discretionary duty. He further asserted that a reasonable officer in the same or similar circumstances could have believed the conduct was justified and the pursuit was necessary, and he said Standifer's actions were neither reckless nor in conscious disregard for the safety of others. Much of Cummings' statements appeared to be based on Standifer's own assertions in his affidavit. Cummings said that the dash cam video showed traffic in both directions yielded to Standifer, but this observation does not take into account the several vehicles that did not yield to Standifer and apparently caused him to have to stop in the middle of the intersection.

The Texas Peace Officer's Crash Report does not provide much additional information regarding the incident, but the officer completing the form noted as the only contributing factor that Standifer had disregarded the traffic signal. In his own incident report, Standifer noted that another motorist, Martinez, had offered to give a statement at the scene.

In her deposition, Martinez confirmed that Standifer turned on his lights before "barely accelerating" into the intersection but the other driver hit him anyway. She also believed Standifer used his siren, but she did not know why he ran the light. Martinez opined that Zakir should have seen Standifer and not hit him.

In her deposition, Zakir testified that she was already in the intersection when Standifer entered it. She said he came out without warning, and she "slammed on [her] brakes" as soon as she saw him. She did not remember who hit whom. She said that she was going the speed limit or less and while she tried her best to stop, she could not have maneuvered to avoid the collision.

As part of her response to DPS's plea and motions, Zakir objected to Standifer's affidavit and moved to strike it as a "sham affidavit" because of conflicts between the affidavit and his deposition testimony. The trial court sustained Zakir's objections in part and struck from Standifer's affidavit all references to him activating his siren and to the driver of the Cavalier attempting to evade a traffic stop. The trial court then denied DPS's plea and motions.

## *Discussion*

As stated, in two issues, DPS asserts the trial court erred by failing to dismiss the case due to sovereign immunity because (1) DPS retained immunity under the emergency exception of the TTCA, and (2) the officer was shielded by official immunity through which DPS was immune by operation of respondeat superior principles. We will begin by discussing the law governing our analysis before turning to each of DPS's issues.

### I. Governing Law

DPS, as an arm of state government, enjoys sovereign immunity. *See Univ.*

6

*of the Incarnate Word v. Redus*, 602 S.W.3d 398, 404–05 (Tex. 2020); *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580–81 (Tex. 2001). Sovereign immunity deprives a trial court of subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). But a defendant may also raise a lack of subject matter jurisdiction in a motion for summary judgment. *Bland I.S.D. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Regardless of the procedural vehicle used, the trial court may consider evidence and must do so when necessary to resolve the jurisdictional issues raised. *Id*. at 555.

We review a challenge to the trial court's jurisdiction de novo. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007). We first look to the pleadings to determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Miranda*, 133 S.W.3d at 226. We construe the pleadings liberally in favor of the plaintiff, look to the pleader's intent, and accept as true the factual allegations in the pleadings. *See id*.

When, as here, the governmental unit challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties. *See id*. at 227. The standard of review for a jurisdictional challenge based on evidence "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)" when, as here, the challenge implicates the merits of a plaintiff's cause of action. *See id*. at 227–28. Under this standard, we generally credit evidence favoring the nonmovant and draw all reasonable inferences in the nonmovant's favor. *See id*. at 228. The defendant generally must assert the absence of subject-matter jurisdiction and present conclusive proof that the trial court lacks subject-matter jurisdiction. *Id*. If the defendant discharges this burden, then the plaintiff must present evidence sufficient to raise a material issue of fact regarding

jurisdiction, or the jurisdictional challenge will be sustained. *Id.*

The TTCA provides a limited waiver of immunity for tort suits against governmental units. *See* Tex. Civ. Prac. & Rem. Code § 101.021; *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 611 (Tex. 2000). As relevant to this case, a governmental entity may be liable for the tort of its employee "acting within his scope of employment" when the tort arises from the operation or use of motor-driven vehicles or equipment and if the "employee would be personally liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021(1)(B); *see also DeWitt v. Harris Cty.*, 904 S.W.2d 650, 653 (Tex. 1995). As will be discussed in more detail below, if the employee is protected from liability by official immunity, then the employee is not personally liable to the claimant and the governmental unit retains its sovereign immunity. *DeWitt*, 904 S.W.2d at 653.

Additionally, under the "emergency exception," the TTCA does not apply to a claim arising:

> from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others.

Tex. Civ. Prac. & Rem. Code § 101.055(2). The plaintiff has the burden of proof to establish that the emergency exception does not apply. *Quested v. City of Hous.*, 440 S.W.3d 275, 284 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Tex. Dep't of Pub. Safety v. Little*, 259 S.W.3d 236, 238–39 (Tex. App.—Houston [14th Dist.] 2008, no pet.). To satisfy this burden, the plaintiff must show either that (1) the employee was not responding or reacting to an emergency, or (2) the response or reaction was not in compliance with the laws and ordinances

8

applicable to emergency action, or in the absence of such a law or ordinance, the action was taken with conscious indifference or reckless disregard for the safety of others. *See City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 (Tex. 2006).

## II. Emergency Exception to TTCA

In DPS's first issue, it contends the trial court lacked jurisdiction over Zakir's TTCA claims because the TTCA's emergency exception applies. DPS raised this issue in its plea to the jurisdiction as well as in its motions for no evidence and traditional summary judgment.

The TTCA does not define the terms "emergency call" or "emergency situation" as used in section 101.055, but Texas courts have interpreted the term "emergency" in this context broadly. *See City of Hous. v. Sauls*, 654 S.W.3d 772, 786 (Tex. App.—Houston [14th Dist.] July 29, 2022, pet. filed). The parties here dispute whether Standifer's observing the Cavalier run a red light constituted an emergency situation, but we will assume for purposes of this opinion without deciding that Standifer encountered an emergency situation before running the red light himself. We therefore turn to the question of whether Standifer's response to the situation was in compliance with the laws applicable to emergency action. *See Hartman*, 201 S.W.3d at 672.

As the parties recognize, sections 546.001 through 546.005 of the Transportation Code govern to some degree the operation of authorized emergency vehicles. Tex. Transp. Code §§ 546.001–.005. As pertinent to this case, under section 546.001, the operator of an emergency vehicle may "proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation." *Id*. § 546.001(2). Section 546.002 limits the application of section 546.001(2) to certain situations, including when the operator is "pursuing an actual or suspected violator of the law." *Id*. § 546.002(2). And under section 546.003, "the operator of an

authorized emergency vehicle engaging in conduct permitted by Section 546.001 shall use, at the discretion of the operator in accordance with policies of the department or the local government that employs the operator, audible or visual signals." *Id*. § 546.003. Section 546.005, however, states that the chapter as a whole "does not relieve the operator of an authorized emergency vehicle from: (1) the duty to operate the vehicle with appropriate regard for the safety of all persons; or (2) the consequences of reckless disregard for the safety of others." *Id*. § 546.005. The Texas Supreme Court has interpreted this final section as "impos[ing] a duty to drive with due regard for others by avoiding negligent behavior" but "only imposing liability for reckless conduct." *City of Amarillo v. Martin*, 971 S.W.2d 426, 431 (Tex. 1998). In other words, the Transportation Code does not waive immunity for "mere negligence"; a showing of recklessness is required. *Id*.

"Under the Transportation Code, reckless driving consists of driving a vehicle in 'willful or wanton disregard for the safety of persons or property.'" *City of San Antonio v. Maspero*, 640 S.W.3d 523, 531 (Tex. 2022) (quoting Tex. Transp. Code § 545.401(a)). "[T]his standard requires 'conscious indifference,' or 'subjective awareness of an extreme risk.'" *Id*. (quoting *Tarrant Cty. v. Bonner*, 574 S.W.3d 893, 902 (Tex. 2019)). "Further, recklessness reflects more than a 'momentary judgment lapse' and instead 'requires a showing that the driver committed an act he knew or should have known posed a high degree of risk of serious injury.'" *Id*. (quoting *Perez v. Webb Cty.*, 511 S.W.3d 233, 236 (Tex. App.—San Antonio 2015, pet. denied)). As relevant to the TTCA and the claims made in this case, the emergency exception does not apply if the operator of the emergency vehicle acted recklessly by an act or omission the operator knew or should have known posed a high degree of risk of serious injury. *Gomez v. City of*

10

*Hous.*, 587 S.W.3d 891, 902 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (citing *Martin*, 971 S.W.2d at 430).[1]

Cases involving collisions with emergency vehicles that ran red lights are not uncommon in our jurisprudence. These cases often focus on such factors as visibility at the intersection, whether the driver of the emergency vehicle activated his lights and sirens, and whether the driver slowed or paused before entering the intersection and waited for other cars to yield. *Compare City of Killeen v. Terry*, No. 03-20-00071-CV, 2022 WL 221240, at *3–4 (Tex. App.—Austin Jan. 26, 2022, pet. filed) (mem. op.) (holding there was a fact issue as to recklessness where officer accelerated through intersection despite his view of traffic being partially blocked); *City of Hous. v. Green*, No. 14-20-00190-CV, 2022 WL 97334, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2022, pet. filed) (mem. op.) (holding there was a fact issue as to recklessness where evidence supported an

---

[1] The concurrence argues that because sections of the Transportation Code apply to the situation presented here—particularly section 546.001(2) authorizing emergency personnel to proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation—we may not address the issue of recklessness. This argument, however, misreads both the governing law and our analysis in this opinion. As set out above, we do not address recklessness under the second prong of section 101.055 because there is indeed law applicable to the emergency situation. Such law includes Transportation Code section 546.005, which states that operators of emergency vehicles are not relieved of the consequences of reckless conduct simply by compliance with other portions of the chapter, such as section 546.001(2). In other words, recklessness is a requirement if the analysis falls under Transportation Code sections 546.001 through 546.005 *or* the recklessness prong of TTCA section 101.055(2). Our analysis in this opinion is pursuant to section 546.005.

This is hardly a new or novel interpretation of the statutory scheme. *See, e.g.*, *Martin*, 971 S.W.2d at 428–32 (analyzing recklessness without first assessing compliance with other governing laws); *City of Brazoria, Tex. v. Ellis*, No. 14-14-00322-CV, 2015 WL 3424732, at *7 (Tex. App.—Houston [14th Dist.] May 28, 2015, no pet.) (mem. op.) (explaining that Transportation Code section 546.005 is law applicable to an emergency situation under TTCA section 101.055(2)); *Gomez*, 587 S.W.3d. at 902–03 (analyzing recklessness without first assessing compliance with other governing laws). The concurrence's interpretation would allow an emergency vehicle operator or, by extension, governmental employer to escape liability for reckless conduct so long as they complied with the specific requirements of Transportation Code sections 546.001 through 546.004. This is not the law.

inference officer entered the intersection without stopping and without his sirens on and his view of traffic was partially obstructed); *Gomez*, 587 S.W.3d at 902–03 (holding there was a fact issue as to recklessness when officer failed to slow his speed, might not have used his emergency lights and siren, and was unable to stop his patrol car before entering intersection in path of another vehicle); *and Perez*, 511 S.W.3d at 237–38 (holding there was a fact issue as to recklessness when officer started to brake before entering intersection but then accelerated through it even though he had a blind spot in his view of oncoming traffic); *with Tex. Dep't of Pub. Safety v. Escobar*, No. 13-20-00267-CV, 2021 WL 6129135, at *3–5 (Tex. App.—Corpus Christi Dec. 29, 2021, pet. denied) (mem. op.) (holding there was no evidence of recklessness where officer activated his siren and lights, slowed as he reached the intersection, and dash cam video showed cross traffic had stopped); *Harris Cty. v. Spears*, No. 14-17-00662-CV, 2018 WL 4571841, at *5–6 (Tex. App.—Houston [14th Dist.] Sept. 25, 2018, no pet.) (mem. op.) (holding there was no evidence of recklessness where officer activated his siren and lights, slowed almost to a complete stop, and proceeded only after other vehicles moved out of his way and he did not see any more approaching vehicles); *Tex. Dep't of Pub. Safety v. Sparks*, 347 S.W.3d 834, 841–42 (Tex. App.—Corpus Christi 2011, no pet.) (holding there was no evidence of recklessness when officer activated lights and siren, "slowed or stopped as he reached the intersection," and entered the intersection "cautiously"); *and Smith v. Janda*, 126 S.W.3d 543, 545–46 (Tex. App.—San Antonio 2003, no pet.) (holding there was no evidence of recklessness where ambulance driver activated lights and siren, "slowed down and looked around" as he approached the intersection, and entered the intersection after "seeing that all traffic had stopped or yielded to him").

In this case, Standifer acknowledged visibility was limited at the intersection

12

and Zakir may not have been able to see him until he was actually in the intersection, leaving her with a maximum of three seconds to react once she saw his vehicle. Standifer also acknowledged, upon viewing the dash cam video, that when he accelerated toward the intersection, he did not slow or pause before entering the intersection. Although Standifer activated his lights before entering the intersection, he said that he only hit his airhorn siren for "a couple of blips." Additionally, the dash cam video from Standifer's vehicle shows that he entered the intersection before crossing traffic had stopped and he apparently had to stop in the lanes going in the direction Zakir was traveling to avoid colliding with traffic traveling in the opposite direction. The evidence presented in this case places it squarely among those cases holding there was a fact issue as to recklessness. *See, e.g.*, *Terry*, 2022 WL 221240, at *3–4; *Green*, 2022 WL 97334, at *6; *Gomez*, 587 S.W.3d at 902–03; *Perez*, 511 S.W.3d at 237–38.

Viewing the evidence in the light most favorable to Zakir, it could be reasonably concluded that Standifer acted recklessly in entering the intersection against the red light. *See Miranda*, 133 S.W.3d at 226. Accordingly, the trial court did not err in denying DPS's plea to the jurisdiction and motions for summary judgment asserting the emergency exception to the TTCA. We overrule DPS's first issue.[2]

### III. Official Immunity Affirmative Defense

In its second issue, DPS asserts that it is shielded from Zakir's TTCA claims

---

[2] Instead of addressing the recklessness issue, the concurrence would hold that there is a fact issue concerning whether Standifer complied with the laws applicable to this emergency situation, specifically the provision that requires operators of emergency vehicles to slow before entering an intersection against a red light. *See* Tex. Transp. Code § 546.001(2). However, it does not appear that Zakir, who has the burden on this issue, raised this ground in the trial court. *See Sauls*, 654 S.W.3d at 785. As explained, we instead conclude that there is a fact question regarding whether Standifer acted recklessly.

13

because of Standifer's official immunity. DPS raised this issue in its traditional motion for summary judgment.

A governmental unit "is vicariously liable for the acts of its employees only to the extent its employees are not entitled to official immunity." *See K.D.F. v. Rex*, 878 S.W.2d 589, 597 (Tex. 1994); *Romero v. Harris Cty.*, No. 14-19-00904-CV, 2021 WL 5183586, at *2 (Tex. App.—Houston [14th Dist.] Nov. 9, 2021, no pet.) (mem. op.). Official immunity is an affirmative defense that protects a government employee from personal liability and, in doing so, preserves a governmental employer's sovereign immunity from suit for vicarious liability. *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 642–43 (Tex. 2015); *Romero*, 2021 WL 5183586, at *2. Because official immunity is an affirmative defense, the burden rests on DPS to establish all required elements. *See Gomez*, 587 S.W.3d at 897. Under the official immunity defense, a government employee may be immune from a lawsuit that arises from the performance of the employee's discretionary duties in good faith, provided the employee was acting within the scope of the employee's authority. *See id*. It appears to be undisputed in this case that Standifer was performing discretionary duties within the scope of his authority at the time of the collision. *See Green*, 2022 WL 97334, at *7. We therefore turn to the question of whether DPS met its burden of conclusively proving Standifer was carrying out his duties in good faith. *See Gomez*, 587 S.W.3d at 897.

We measure good faith in these circumstances under a standard of objective reasonableness without regard to the officer's subjective state of mind. *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997). Therefore, to establish good faith in a police pursuit case, an officer must conclusively prove that a reasonably prudent officer in the same or similar circumstances could agree that the *need* to immediately stop or apprehend the suspect outweighed the *risk* of harm to the

14

public in continuing the pursuit. *See Univ. of Hous. v. Clark*, 38 S.W.3d 578, 583 (Tex. 2000) (holding that the good faith factors discussed in *Wadewitz* apply in the police pursuit context). The need element requires an assessment of the importance of immediately apprehending a suspect, considering the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to apprehend a suspect or to prevent injury or loss of life, and what alternative courses of action, if any, are available to achieve a comparable result. *Id*. The risk element requires assessments of the nature, severity, likelihood, and obviousness of the risks of the officer's actions. *Id*. "[A]n officer acts in bad faith only if he could not have reasonably reached the decision in question." *Id*.

Regarding need, Standifer stated that in pursuing the Cavalier through the red light, he was attempting to initiate a traffic stop in order to enforce a traffic law. Standifer acknowledged in his deposition that running a red light was a low-level offense only punishable by a fine and not as serious as other offenses such as robbery. Citing Cummings' affidavit, DPS suggests that the need for immediate pursuit was elevated in this case because the Cavalier ran the light only after Standifer pulled up to the intersection in his patrol vehicle; the implication being that the Cavalier driver was fleeing from Standifer. It should be noted, however, that the video shows Standifer was the fifth vehicle back in the right lane, and thus not clearly visible to the driver of the Cavalier at the front of the left lane, and the Cavalier only ran the light after vehicles in the right lane began turning right. Standifer also testified that he had no idea why the Cavalier ran the light. Although it is possible the Cavalier ran the red light because of Standifer's presence, it appears just as likely, if not more so, that the driver simply decided to run the light or mistakenly thought the light had changed to green. Standifer further opined that running a red light posed a high risk of danger to the public, but he did not explain

why it was important to immediately apprehend the suspect or how immediately pursuing the suspect could prevent injury or loss of life.

DPS asserts that Standifer considered alternative courses of action but neither DPS nor Standifer has discussed what alternatives were available or whether they were viable under the circumstances. *See Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 644 (Tex. 2015) (per curiam) ("Summary-judgment proof does not provide a 'suitable basis' for determining good faith if it fails to address several factors we have identified as bearing on the need/risk analysis, including the availability of any alternative action."); *see also Gomez*, 587 S.W.3d at 897–98. Obviously, a peace officer in the same or similar circumstances could decide to not pursue the traffic offender or to wait to do so until after the light had changed; an officer could also stop or slow before entering the intersection, turn on his lights and siren, and proceed only once the traffic had stopped or cleared.[3]

Regarding the risk element, DPS points to Standifer's assertion in his affidavit that at the time of the collision, it was a clear, sunny, and dry day. DPS also emphasizes that Standifer had activated his lights and utilized his airhorn siren before entering the intersection, and it relies on Cummings assertion in his affidavit that "[t]he evidence indicates that the road was dry, it was daylight, there was no rain or visibility obstructions, and the other vehicles on the road had either stopped or were otherwise yielding the right of way." But as discussed above, Standifer

---

[3] In concluding that the evidence shows Standifer assessed the availability of alternative courses of action, the concurrence insists that Standifer could not have discerned the Cavalier's license plate number and thus could not have otherwise identified the offending driver except by pursuing the vehicle through the red light. The concurrence bases this conclusion not on Standifer's statement that he could not read the license number—as Standifer made no such assertion—but on the fact the plate could not be read on the low-quality dash cam video. At the time the Cavalier ran the light, Standifer was approximately three car lengths back. We decline to hold that the evidence proves Standifer could not have read the license number or that DPS, which does not make the argument put forth by the concurrence, established that Standifer considered alternative courses of action.

16

acknowledged visibility was significantly limited at the intersection, he did not slow or pause before entering the intersection, and he only hit his airhorn siren for "a couple of blips." Additionally, the dash cam video shows Standifer entered the intersection before crossing traffic had stopped and he had to come to a complete stop in the intersection to avoid hitting traffic going in the opposite direction of Zakir. The potential risk of this course of action seems clear. As the supreme court has noted, "when an officer approaches a busy intersection with a red light and intersecting traffic is approaching the intersection on a green light and at a high rate of speed, the risk of collision significantly increases." *Clark*, 38 S.W.3d at 584. On the evidence presented, DPS has failed to establish that a reasonably prudent officer in the same or similar circumstances could agree that the need to immediately stop or apprehend the suspect outweighed the risk of harm to the public in continuing the pursuit. *See id*. at 583.

Because DPS's evidence did not address alternative actions that Standifer could have taken and did not otherwise establish that a reasonably prudent officer in the same or similar circumstances could agree that the need to immediately stop the Cavalier driver outweighed the risk of harm to the public, the burden never shifted to Zakir to produce controverting evidence. *See id*.; *Green*, 2022 WL 97334, at *9. Accordingly, the trial court did not err in denying DPS's motion for summary judgment and we overrule DPS's second issue.

Having overruled each of DPS's issues, we affirm the trial court's order denying DPS's plea to the jurisdiction and motions for summary judgment.


/s/    Frances Bourliot
        Justice

Panel consists of Justices Jewell, Bourliot, and Poissant. (Jewell, J., concurring).

17